507 A.2d 1098

**John BOOTH a/k/a Marvin Booth**

v.

**STATE of Maryland.**

No. 151, Sept. Term, 1984.

Court of Appeals of Maryland.

May 7, 1986.

---

4. *Illinois v. Allen,* 397 U.S. at 344, 90 S.Ct. at 1061.

5. *Ibid.*

6. *Holbrook v. Flynn,* 106 S.Ct. at 1346.

Julia Doyle Bernhardt and George E. Burns, Jr., Asst. Public Defenders (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Valerie V. Cloutier, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

RODOWSKY, Judge.

We shall affirm the judgments of conviction and death sentence in this case for the reasons set forth below. Of the nineteen issues raised on appeal only issues eight through ten present questions of any novelty. These deal with the right of allocution conferred by a Maryland Rule of Procedure which was made applicable to capital cases as of July 1, 1984.

Appellant, John "Ace" Booth (Booth), and his friend, Willie "Sweetsie" Reid (Reid), in order to obtain money for heroin, on May 18, 1983, robbed and murdered an elderly couple in the victims' home. The victims were Irvin Bronstein, age 78, and his wife, Rose, age 75. Their bodies were found by their son on May 20 in the living room of their home. Each had been stabbed in the chest twelve times, after having been bound and gagged. Mr. Bronstein was

found reclining face up on the sofa, with a cloth covering his face. Mrs. Bronstein was found face down on the floor. Their home had been ransacked. Property, including television sets, jewelry, and their 1972 Chevrolet Impala automobile, had been taken. The police found the automobile abandoned and partially stripped on the parking lot of the Flag House high-rise public housing projects in East Baltimore. The police were able to associate Booth with the abandoned car and arrested Booth June 7, 1983.

The first trial of the charges against Booth, before Honorable James W. Murphy, ended in a mistrial on April 23, 1984. *See Booth v. State,* 301 Md. 1, 481 A.2d 505 (1984). At retrial, a jury presided over by Judge Edward J. Angeletti in the fall of 1984 heard both the guilt or innocence phase and the sentencing phase. The jury found Booth guilty of the murder of Mr. Bronstein in the first degree, both premeditated and felony, and found that Booth was a principal in the first degree to that murder for which they imposed the death sentence. The jurors found Booth guilty of murder in the first degree of Mrs. Bronstein for which the court imposed a life sentence.[1] Booth also received three consecutive sentences of twenty years each, the first of which was consecutive to the life sentence, for the robbery of Mr. Bronstein, the robbery of Mrs. Bronstein, and for conspiring with Reid and with his nephew, Darrell Brooks, to rob the Bronsteins.

On this appeal Booth challenges the sufficiency of the evidence against him only as to the charge of conspiracy to rob. Neither Booth nor Reid testified as witnesses at Booth's trial at which the jury could have found the following facts on guilt or innocence.

---

1. Willie Reid was the principal in the first degree to the murder of Mrs. Bronstein for which Reid was sentenced to death. In Reid's case we have affirmed the judgments of conviction and ordered further proceedings with respect to the death sentence, without affirmance or reversal of the death sentence. *See Reid v. State,* 305 Md. 9, 501 A.2d 436 (1985).

The Bronsteins lived at 3412 Rockwood Avenue in West Baltimore. Booth, age 29 at the time of the murders, lived with his mother at 3416 Rockwood Avenue. Booth's friend Reid lived with his girlfriend, Veronda "Ronnie" Mazyck and her two sons, age nine and four at the time of the murders, in Ms. Mazyck's apartment at 400 Aisquith Street in East Baltimore. On May 18, 1983, Booth met Reid at Mazyck's apartment at about 4:00 p.m. Mazyck went out with her children and, when she returned about 8:00 to 8:30 p.m., no one was at home. Reid and Booth returned to the apartment at about 9:00 p.m. They had heroin which Booth, Reid, and Mazyck injected. Reid also had a small brown paper bag filled with jewelry.

When the contents of the bag were spread on a tabletop, Mazyck commented that the jewelry was cheap to which Reid, in the presence of Booth, replied that it was "white people's shit." In response to a question from Mazyck, Reid, in Booth's presence, said he had made a "hustle" which Mazyck interpreted as meaning that "they went out and stole it."

At some point Booth telephoned his girlfriend, Jewell "Judy" Edwards,[2] who lived in the 2600 block of Harford Road, and asked her to meet him at Mazyck's apartment. Booth wanted Edwards to drive a car. She was a licensed operator but Booth, Reid, and Mazyck were not licensed.

Renee "Tony" Collins, a 17-year-old mother of two children who lived in the apartment across the hall from Mazyck, dropped by Mazyck's apartment while the jewelry was spread on the table. Booth and Reid asked her if she wanted to buy any of it. While Ms. Collins was in the apartment, Eddie Smith, his girlfriend, and another couple stopped by the apartment. Smith paid Reid $2 so that he and his companions could use the apartment to inject themselves with heroin. Ms. Collins heard Booth and Reid

---

**2.** Booth and Jewell Edwards were married June 2, 1983, five days before Booth was arrested.

asking "the junkies" for the use of a car so that Booth and Reid could pick up some television sets.

When Ms. Edwards arrived at the Mazyck apartment, Booth explained that he wanted her to drive the car of a friend of his and that he needed someone who had a driver's license in the event the car was stopped by the police.

Late on the evening of May 18 or early in the morning of May 19 all of the adults left the Aisquith Street apartment. Smith and his companions went their separate way. Booth and Ms. Edwards, Reid and Ms. Mazyck told Ms. Collins that they were going "[t]o pick up the T.V.'s."

The two couples took a cab to Booth's mother's home. Booth went in the house while the other three remained outside. Booth came out with green plastic trash bags. He then went back into his mother's house and came out with gloves for everyone to wear. The group then went to the rear of the Bronstein home. Before entering, Booth pointed the Bronsteins' car out to Ms. Edwards as the car which she would be driving and handed her the keys to the car. Also before the group entered the Bronstein home, Booth told the women that they should pay "no mind" if they saw any dead bodies.

The two couples entered the house through the rear door and the two women saw the bound and gagged corpses of Mr. and Mrs. Bronstein in the living room. The group looted the house and loaded the loot, including two television sets, into the Bronsteins' car. When someone realized that they had left a trash bag in the house, Booth said not to worry because the police would think that the bag had been left by people who were working on the Bronsteins' lawn that day.

The two couples returned with the loot to the Aisquith Street apartment. Booth and Reid obtained heroin and the couples "fired up" and went to bed, Reid and Ms. Mazyck in the bedroom, while Booth and Ms. Edwards used a sofa bed in the living room. While lying in bed Ms. Edwards asked Booth if the people whom she had seen in the house were

actually dead, and Booth replied that they were and that he had killed the man while Reid had killed the woman.

The next morning Ms. Mazyck asked Booth why the elderly couple had been killed, and Booth told her that it was because the elderly couple knew Booth and his nephew.

## Issues as to Guilt or Innocence

### I

■ During voir dire of prospective jurors Booth had moved to strike one of them for cause and the motion was denied. Booth argues that the juror had heard that a previous guilty verdict had been overturned and had stated that he would give more weight to the testimony of a police officer than to other witnesses. Error, if any, in denying the challenge was waived and was harmless beyond a reasonable doubt. The venireman in question did not serve as a juror and was not the object of the exercise by the defense of one of its allotted peremptory challenges. The jury was impaneled without Booth's having exhausted all of his peremptory challenges. Immediately prior to the State's calling its first witness defense counsel advised the court that "the Court's jury is acceptable to the defense subject to the previous objections that have been made with regard to the *Witherspoon* matter, and bifurcation." *See Foster v. State,* 304 Md. 439, 450–51, 499 A.2d 1236, 1241–42 (1985) and cases cited therein.

### II

Appellant's second issue reaches back into the period preceding the aborted first trial and asserts that the circuit court erred in denying an oral defense motion that the court order Veronda Mazyck to submit to a psychiatric examination by a particular psychiatrist who had been identified in discovery as an expert witness for Booth. The point is frivolous.

On the afternoon of March 27, 1984, the defense supplemented its answer to the State's motion for discovery and advised that Booth intended to call Dr. John Henderson to

explain records of Johns Hopkins Hospital relating to Ms. Mazyck's condition and treatment in April-May 1982. At a pretrial hearing on April 3, 1984, the State orally moved that Judge Murphy preclude the defense from using the hospital records and from having expert testimony based upon them. The prosecutor represented that the records related to psychiatric treatment. He then called Ms. Mazyck as a witness in support of the motion. She testified to her preference that any such records be kept secret and said that she had not consented to the release of any such records. The purpose of this testimony was to lay a foundation for a legal argument, to be made on a later day, that the records represented privileged communications between patient and psychiatrist as recognized in Md. Code (1974, 1984 Repl. Vol.), § 9–109 of the Courts and Judicial Proceedings Article.

Jury selection for the first trial started on April 9, 1984, and continued through April 11. Late in the day of April 11 defense counsel delivered to the State a memorandum in opposition to the State's motion to preclude. Appellant contended that the records showed Ms. Mazyck was diagnosed as an alcoholic and a polydrug abuser, who had experienced auditory and visual hallucinations and memory blackouts. Booth submitted that those conditions affected Ms. Mazyck's credibility and that Dr. Henderson was needed to explain technical matter in the hospital records to the jury.

At argument before Judge Murphy on April 12 the State ultimately took the position that the hospital records could be admitted but only through the particular attending physician whose opinions on medical matters were contained therein. The court ruled that it would permit use of the psychiatric records if the defense brought in the doctor who had made the diagnosis. Defense counsel said that she would certainly try to do that. The court further indicated that if the attending doctor was not available he would allow Dr. Henderson to testify to the meaning of terms in the medical records. After the court had quickly disposed

of certain unrelated matters, defense counsel orally moved "that the court order that Veronda Mazyck make herself available for examination by one of our doctors, Dr. Henderson." When the State asked if the defense were questioning Ms. Mazyck's "capacity" to testify as a witness, defense counsel replied that "capacity is a very difficult hurdle to make. Her competency is what the State is talking about, I imagine." At that point Judge Murphy denied the motion, without stating any reason for the ruling.

On the afternoon of Friday, April 13, opening statements were made to the jury and the first witness in the State's case was heard. On the following Monday, April 16, at 10:07 a.m. counsel for Booth filed a motion, together with an order signed by Judge Murphy, directing the production of the Johns Hopkins Hospital Comprehensive Alcoholism Program records on Ms. Mazyck. The motion recited that the evidence of Ms. "Mazyck's alcoholism is relevant to her credibility as a witness for the State in this case." That afternoon Ms. Mazyck began her direct examination testimony at the first trial. Her direct was resumed on the morning of April 17. Cross-examination, which began that morning and continued well into the afternoon, encompasses seventy pages of transcript. The hospital records were used in the cross-examination and were marked for identification.

At the retrial Ms. Mazyck was again examined and cross-examined at length, including cross-examination about the extent and effects of her drug and alcohol abuse.

In his brief on this appeal Booth characterizes the trial court's refusal to order a psychiatric examination of Veronda Mazyck as a ruling on a motion for an examination "by a defense doctor on the issue of whether she was competent to testify." At no time, either in connection with the trial or retrial, did appellant move to exclude testimony from Ms. Mazyck on the ground that she was incompetent to be a witness. At no time did appellant present any medical

opinion, by affidavit or otherwise, that it was likely that Ms. Mazyck was incompetent.

> "The test of incompetency is whether the witness has 'sufficient understanding to appreciate the nature and obligation of an oath and sufficient capacity to observe and describe correctly the facts in regard to which [the witness] is called to testify.'" [*Evans v. State*, 304 Md. 487, 507, 499 A.2d 1261, 1271 (1985) (quoting from *Johnston v. Frederick*, 140 Md. 272, 281–82, 117 A. 768, 771 (1922)).]

While Judge Murphy did not state for the record his reason for denying appellant's oral motion of April 12, 1984, the court could have viewed the request as an attempt to lay a foundation for Dr. Henderson to express opinions which Booth would then argue were relevant to credibility, as opposed to competency. Were that the basis of the ruling, there would be no abuse of discretion. A trial judge has discretion to determine whether opinion evidence of questionable relevance will be sufficiently helpful to the jury. *See Stebbing v. State*, 299 Md. 331, 350, 473 A.2d 903, 912, *cert. denied,* —— U.S. ——, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984).

If, however, we consider that appellant's oral motion was, as appellant now contends, a motion directed to Ms. Mazyck's competency to testify, Judge Murphy had already observed her when she testified briefly on April 3, 1984. That personal observation, coupled with the lack of any objection to competency at that time, would furnish an appropriate basis for the court's ruling.

In any event, when "determining whether a request for a mental examination should be granted, ... a trial judge should carefully balance the demonstrated necessity for a compelled examination against the existence of important countervailing considerations." *Evans,* 304 Md. at 508, 499 A.2d at 1272. Here the appellant possessed copies of the hospital records of Ms. Mazyck's psychiatric treatment by the time she testified at the first trial, if not earlier. But

for the ambiguous and somewhat off-handed oral motion of April 12, 1984, appellant's position in the trial court was that the records were relevant to credibility. Ms. Mazyck testified at length at two trials without her demeanor causing either the court or counsel to question her *competence*. Under these circumstances appellant has failed to show that there was any abuse of discretion in the denial of the oral motion.

### III

■ This issue concerns an alleged error in the admission of evidence during the direct examination by the State of Eddie Smith. Smith testified that he had injected himself with heroin in Mazyck's bathroom in the presence of Reid with whom Smith had had a conversation. The State then questioned Smith as follows:

Q. After you left the bathroom—

A. Right.

Q. —what, if anything, did you say to this defendant [Booth], and use the exact words as best you can remember?

A. I asked Ace what was Sweetsie talking about, he said—

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

Q. [STATE'S ATTORNEY]: You may answer.

A. He [Reid] said he had just killed a couple mother fuckers.

Q. Did Ace respond to what you said?

A. Yes, he did.

Q. What, if anything, did he say?

A. He [Booth] said he [Reid] was just exaggerating, you know, talking something, *he* didn't know what he was talking about. [Italics added.[3]]

---

**3.** The nearest antecedent to the italicized "he" indicates it refers to Reid.

A colloquy at the bench which had followed objection to an earlier form of the same question developed the basis for the objection to be hearsay. Booth briefs this evidence point alternatively. He says that if the ruling was based on the theory that Reid and Booth were co-conspirators in a conspiracy to rob, Reid's statement to Smith was not admissible against Booth because any conspiracy to rob had terminated. Booth further contends that Reid's statement cannot be admissible as part of an admission against interest made by Booth because, when told of Reid's statement, Booth's response "adds up to a clear-cut denial." *McCormick on Evidence* § 270 (E. Cleary 3d ed. 1984).

There was no error. Booth's response that Reid was exaggerating and did not know what he was talking about was an admission by Booth. Smith's conversation with Booth took place while Reid and Booth anticipated returning to the Bronsteins' home in order to steal more property, but before they had left Aisquith Street to go to the Bronsteins' for the second time. Under all of the evidence the jury could consider Booth's statement as an effort to minimize and cover up Reid's incriminating statement to Smith so that Smith would not, even inadvertently, upset the joint plan of Reid and Booth to return to the murder scene with a licensed driver.

## IV

■ This assignment of error is directed at an instruction to the jury concerning premeditation. The court defined premeditation in its charge and no exception was taken to that definition.[4] The court told the jury in Booth's case "that you may consider the multiple injuries and their intensity suffered by the victim as providing adequate evi-

---

**4.** Recently, in *Ferrell v. State,* 304 Md. 679, 684, 500 A.2d 1050, 1052–53 (1985), we repeated the definition of premeditation drawn from *Chisley v. State,* 202 Md. 87, 106, 95 A.2d 577, 585–86 (1953) as "some appreciable period of time during which [the accused], after having formed 'a specific purpose and design to kill' had 'full and conscious knowledge of the purpose to do so.'"

dence of premeditation." Booth challenges the latter instruction. Citing *People v. Anderson,* 70 Cal.2d 15, 447 P.2d 942, 73 Cal.Rptr. 550 (1968); *People v. Hoffmeister,* 394 Mich. 155, 229 N.W.2d 305 (1975); and *Austin v. United States,* 382 F.2d 129 (D.C.Cir.1967), he contends that "the number of injuries cannot, *alone,* constitute proof of this element." (Emphasis in original).

We initially note that the challenged instruction merely told the jury that it "may consider" the multiple wounds as adequate evidence of premeditation, but the instruction did not limit the jury's consideration of all of the evidence when applying the definition of premeditation.

Further, the proposition which appellant distills from the cases cited by him is contrary to Maryland law. The intervals between the stab wounds inflicted on Mr. Bronstein evidence sufficient time for reflection and decision. *See Ferrell v. State,* 304 Md. 679, 684, 500 A.2d 1050, 1052–53 (1985); *Colvin v. State,* 299 Md. 88, 109, 472 A.2d 953, 963–64 (1984); *Hyde v. State,* 228 Md. 209, 216–17, 179 A.2d 421, 424–25 (1962); *Cummings v. State,* 223 Md. 606, 611–12, 165 A.2d 886, 888–89 (1960); *Kier v. State,* 216 Md. 513, 522–23, 140 A.2d 896, 900 (1958); and *Chisley v. State,* 202 Md. 87, 106–09, 95 A.2d 577, 585–87 (1953).

Finally, the evidence of premeditation in the instant case is not limited to the multiple wounds. Mr. Bronstein was stabbed when his hands were tied behind his back, and Booth admitted to Ms. Mazyck that the people were killed because they knew Booth and his nephew.

## V

■ Booth contends that the evidence was legally insufficient to support his conviction for conspiracy to rob. The principle which appellant says applies here is that there must be, in addition to evidence of the commission of a robbery, evidence that a meeting of minds occurred prior to the commencement of the robbery. Here no witness testified to what transpired between Booth and Reid prior to, or

at the time of, the first entry into the Bronsteins' home in the late afternoon or early evening of May 18, 1983.

Booth's argument is fully answered by the statement of facts which opens this opinion. The direct evidence is that by 9:00 p.m. on the day of the murders Booth and Reid were at Ms. Mazyck's apartment with loot from the Bronsteins' home and that they planned to return there with a licensed driver in order to use the Bronsteins' car to haul away more loot. This evidence supports the reasonable inference that Booth and Reid were acting in concert during the initial entry when the robberies of Mr. and Mrs. Bronstein occurred. From the standpoint of conspiracy to rob it is immaterial whether the robberies committed during the first entry are viewed as fully consummated crimes or merely as the earlier phase of continuing robberies which concluded when Booth *et al.* returned to the Bronsteins' home later that night.

Another inference, theoretically consistent with the direct evidence, would be that Booth and Reid met coincidentally at the Bronsteins' home at the time of the earlier entry and commenced separate robberies acting independently of each other. That alternative is absurd.

## VI

During jury selection appellant objected to the disqualification of potential jurors who expressed opposition to the death penalty. He also expressly requested that two juries be impaneled, one to determine guilt or innocence which would include opponents of the death penalty, and another to determine sentence if that were to become necessary. There was no error in excluding prospective jurors opposed to capital punishment or in refusing to impanel separate juries. The arguments advanced by Booth here were fully considered and rejected on the merits in part I B of our recent opinion in *Foster v. State*, 304 Md. 439, 453–66, 499 A.2d 1236, 1243–51 (1985).

## VII

In its instructions to the jury at the guilt or innocence phase the trial court had included the following paragraph.

The general rule is that there is an inference of guilt which arises from the possession of recently stolen property. Upon proof of the corpus delicti, the inference is strong enough to establish the criminal agency of the possessor of such goods and thus to sustain the conviction. If a robbery with a dangerous and deadly weapon is proved to have been recently committed, the inference is that the possessor of goods taken during its commission was the robber.

Booth submits that by saying "the inference is" the trial court improperly converted an inference into a presumption because only presumptions can be stated as existing whereas inferences exist only if and when the trier of fact has chosen to find them.

■ This point has not been preserved for appellate review. Maryland Rule 4–325(e) provides that "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects on the record ... stating distinctly the matter to which the party objects and the grounds of the objection." In the instant case the trial judge prepared his instructions in writing and gave counsel the opportunity to review and to take exceptions to them in advance of his reading them to the jury. Booth did not except to that portion of the charge of which he now complains.

■ Furthermore, were the matter properly before us, we would hold that there was no prejudicial error in light of the charge as a whole. The trial judge instructed the jury generally on inferences in a portion of his charge which preceded, and which was separated by only two paragraphs from, the paragraph in which Booth now claims error lies. The general charge read:

There are two types of evidence which the jury may consider in this case, direct or circumstantial evidence.

Direct evidence is the evidence that is attributable to actual knowledge of a fact such as an eyewitness. Circumstantial evidence is that which proves the facts indirectly or facts and circumstances from which an inference may arise. The law makes no distinction between direct and circumstantial evidence. No greater degree of certainty is required of circumstantial evidence than direct evidence since in either event you must be convinced of the defendant's guilt beyond a reasonable doubt.

You are further instructed that in a criminal case the defendant is entitled to every inference which can reasonably be drawn from the evidence and where two inferences can be drawn from the same evidence, one consistent with guilt and one consistent with innocence, the defendant is entitled to the inference which is consistent with his innocence.

## Issues Relating to Sentencing

### VIII, IX and X

Appellant's eighth, ninth, and tenth contentions will be considered together because they involve the exercise by Booth of the right of allocution in capital cases conferred by Maryland Rule 4–343. Subsection (d) provides: "Allocution. —Before sentence is determined, the court shall afford the defendant the opportunity, personally and through counsel, to make a statement."

After Booth had been found by the jury to be guilty of Mr. Bronstein's murder, that same jury sat to determine whether his sentence should be life imprisonment or death. The State's case at the sentencing phase consisted entirely of the presentence investigation report and the victim impact statement. After nonparty witnesses for the defense had testified, Booth and his counsel approached the bench. Counsel repeated on the record advice previously given Booth concerning his right to testify. Counsel told Booth that if he decided not to testify he still had "the right to allocute," which was explained as "the right to tell the jury

why you feel they should not execute you." Counsel said that the court would instruct the jury that Booth's failure to testify could not be held against him, but when counsel asked the court to confirm the legal accuracy of that statement the judge replied: "No, I don't believe that's accurate. That only held true for the guilt or innocence phase of this trial." The court said it was "directly up to Mr. Booth whether he wants to testify or not at this point. Nothing will be said to the jury about that." After further discussion the court agreed with Booth's request that he be allowed to consider the matter overnight and advise of his decision the following morning.

The next morning Booth said that he would not testify but that he would allocute. At the court's request Booth explained the difference in his own words.

Well, if I testify, I would be subject to cross-examination by the counsel for the State and if I allocute, I can't be cross-examined—well, I won't be cross-examined.

THE COURT: All right. Do[—]you will make an argument to the jury concerning whatever you want to say to the jury; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: All right. You understand that you will not be under oath and you will not be examined by anyone as to what you say to the jury?

THE DEFENDANT: Yes sir.

The jury was then brought into the courtroom and told by the judge that "the defendant has the right to address you and say whatever it is he wishes to say to you concerning the matters that you are going to be deliberating on." Booth, who had elected not to testify at the guilt or innocence phase, opened his statement to the jury by saying that "I finally get a chance to say something to you." In his address, which transcribes to seven and one-half pages, Booth denied killing anyone. He admitted only to having entered the Bronstein home late in the evening, after the murders had been committed, in order to steal. He at-

tacked the prosecutors for fabricating statements of witnesses and putting words in their mouths. He said his general occupation was being a thief but he was not a robber or murderer.

In its summation the State told the jury, over objections by defense counsel, that Booth's statement was not evidence, that Booth, in order to avoid cross-examination, had not taken the witness stand, and that Booth had lied to the jury and should not be believed.[5]

---

5. The relevant portion of the State's argument reads:

[N]othing that John Booth said to you this morning is evidence.
[DEFENSE COUNSEL]: Objection, your Honor.
THE COURT: Overruled.
[STATE'S ATTORNEY]: Remember what the Judge told you, I believe in his very first statement to you, evidence is three things. It is stipulations, that which counsel agrees to be fact, it is documents or pictures or actual objects placed into evidence and it is testimony under oath subject to cross-examination from the witness chair. What you heard this morning was John Booth in his right of allocution. Something different than testimony. For the law provides that any man before he is sentenced can say anything that is on his mind. But anything that is on his mind is not an elevated level of evidence.
[DEFENSE COUNSEL]: Objection, your Honor.
THE COURT: Overruled.
[STATE'S ATTORNEY]: There is but one reason John Booth did not take the witness stand and present his story as he told it to you in allocution. I'm not so naive a man to believe Mr. Booth would be so moved by the prospect of an oath that he would not break his oath. But, ladies and gentlemen, he stood here and testified, not under oath, for one reason only, to avoid cross-examination.
[DEFENSE COUNSEL]: Objection, your Honor.
THE COURT: Overruled.
[STATE'S ATTORNEY]: I assure you we had some questions for Mr. Booth. I ask you, don't be conned by this con man, don't be conned by this man who travels with fifteen names, don't be conned by a most accomplished liar.
But, even though, we had no cross-examination, even though we couldn't ask the man one question—
[DEFENSE COUNSEL]: Objection.
THE COURT: Overruled.
[STATE'S ATTORNEY]: —the lies shined through his statement. He just wasn't, for all his talents, a con man. He just wasn't that good a liar. Do you realize what he has actually said to you?

In his brief to us Booth argues that the trial court erred (a) in allowing the State to argue that Booth's "allocution was not evidence to be considered by the jury," (b) "in permitting the prosecutor to comment on appellant's failure to testify at his capital sentencing proceeding," and (c) "in refusing to instruct the jury that it could not draw any inference adverse to appellant from his failure to testify during the sentencing proceeding." Before we can address these specific assignments of error, we must explore the nature of the "allocution" here involved.

After January 1, 1979, and prior to the revision of the Maryland Rules effective July 1, 1984, there was no rule applicable to allocution in capital cases. There was, however, an allocution rule applicable to noncapital cases, former Rule 772 d. At the Rules Committee meeting of October 15/16, 1982, a member proposed that the allocution rule apply to capital cases as well. Minutes of the committee reflect that certain benefits of such a change were discussed. These were the opportunity for the defendant "to make a statement in favor of imposition of a sentence of life imprisonment as opposed to death" and that, because in a court sentencing in a capital case a judge would likely never refuse a request by the defendant to make a statement, the absence of a provision for allocution before a jury in capital cases might raise constitutional questions. As burdens to be anticipated from the proposal one member pointed to the existing complexity of capital cases while the

---

The prosecutor then argued from the content of Booth's statement that Booth had contradicted himself on each of two aspects of the allocution. Continuing, counsel for the State said:

Ladies and gentlemen, he could have said anything that he wanted when he stood here before you. Anything. The one thing he did not say is this, I am sorry for what I have done. For I submit, he is not and in the final analysis, with his life on the line, not subject to cross-examination—

[DEFENSE COUNSEL]: Objection, your Honor.

THE COURT: Overruled.

[STATE'S ATTORNEY]: —He has attempted once again to lie his way out of his problems. Please, please do not be so naive as to let him do that.

chief of the Criminal Division of the Attorney General's Office anticipated concerns in State's Attorneys' offices "about unsworn statements being made by the defendant immediately prior to the jury's retiring to consider its verdict." The Rules Committee then voted to recommend to this Court that the rule applicable to noncapital cases be amended as follows (brackets indicate matter to be deleted and italics indicate matter to be added to the text of former Rule 772 d, then tentatively renumbered Rule 4–703(d) in the Committee's working draft for the rules revision project):

Before imposing sentence, the court shall [inform] *afford* the defendant [that he has the right] *the opportunity,* personally and through counsel, to make a statement and to present information in mitigation of punishment[, and the court shall afford an opportunity to exercise the right].

That recommendation is now Rule 4–342(d).

The Committee also decided to make the amended allocution rule applicable to capital cases, with the further deletion of the provision for presentation of information in mitigation of punishment. That recommendation is now Rule 4–343(d).

The obvious purpose of Rule 4–343(d) is to afford the death penalty eligible, convicted murderer the opportunity to make an unsworn statement in mitigation of the death penalty without being subject to cross-examination. In this respect the statement is similar to closing argument, but it is not completely analogous to closing argument because the factual content of the allocution is not limited, in general, to the record in the case, inferences therefrom, and matters of common human experience. In that allocution is unsworn and is not subject to cross-examination, it is not testimony in the conventional sense. Nevertheless, allocution may be considered by the sentencing authority. Under Md.Code (1957, 1982 Repl.Vol., 1985 Cum.Supp.), Art. 27, § 413(g)(8) the sentencing authority may find by the preponderance test "[a]ny other facts which the [sentencing au-

thority] specifically sets forth in writing that it finds as mitigating circumstances in the case." [6] In Booth's case, after the jury had found the aggravating circumstance of murder in the course of robbery, the jury was free to find as a mitigating circumstance such aspect of the content of Booth's allocution on which the jury could unanimously agree, simply by specifically setting it forth on the sentencing form. Further, if the jury found any such mitigating circumstance in the allocution the jury was obliged to weigh that mitigating factor in determining whether the sentence should be life or death.

█ Within the bounds of permissible jury argument the prosecutor's summation honored the principles discussed above. Counsel for the State contrasted Booth's allocution with the elevated level of evidence which is sworn testimony subject to cross-examination. The record does not factually support Booth's contention that the prosecutor told the jury that it could not consider Booth's allocution. Indeed, the entire thrust of the argument objected to by Booth was a recognition by the State that the jury *could* consider the content of Booth's statement to be true, but that the jury *should* not.

█ Among the reasons given by the State why the jury should reject as false the content of Booth's allocution was that it was unsworn and was not subject to cross-examination. Because the content of a convicted defendant's allocution may be considered by the jury or court in mitigation, the State, as a matter of nonconstitutional Maryland law, may comment on that allocution and urge its rejection by arguments which may include attacking the defendant's credibility by explicit reference to the lack of an oath and to the lack of testing by cross-examination.

Booth further submits that such comment violates his Fifth Amendment protection against compulsory self-in-

---

**6.** All statutory references, unless otherwise noted, will be to Art. 27.

crimination because it is also a comment on Booth's failure to testify at the sentencing proceeding.

Appellant's argument assumes as its major premise the applicability here of the rule in *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). After *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) had held that the Fifth Amendment prohibition against compulsory self-incrimination was applicable to the states through the due process clause of the Fourteenth Amendment, *Griffin* held that references by a California court and prosecutor to Griffin's failure to testify violated the United States Constitution. The case was a two-stage death penalty trial. Griffin had not testified at the guilt or innocence stage. The court had instructed the jury that it could take into consideration on the issue of guilt Griffin's failure to deny or explain evidence which he would reasonably be expected to deny or explain because of facts within his knowledge. In argument the prosecutor had enumerated aspects of the case which the defendant had not seen fit to explain or deny by taking the stand. Such comment on the refusal to testify was held to be "a penalty imposed by courts for exercising a constitutional privilege [which] cuts down on the privilege by making its assertion costly." *Id.* at 614, 85 S.Ct. at 1232–33, 14 L.Ed.2d at 109–10.

 The right is also infringed where the government elicits on cross-examination of the defendant at a second retrial that the defendant had not testified at the prior trials. *See Stewart v. United States,* 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961). Nor is a procedure constitutionally permissible which requires the defendant to testify as the first witness in the defense case or not at all. *Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972). In *Carter v. Kentucky,* 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), the Court held that a defendant who had not testified was entitled, upon request, to an instruction that his election not to testify could not be used

as an inference of guilt and should not prejudice him in any way. The Court reasoned that

> [j]ust as adverse comment on a defendant's silence "cuts down on the privilege by making its assertion costly," [*Griffin,* 380 U.S.] at 614 [85 S.Ct. at 1232], the failure to limit the jurors' speculation on the meaning of that silence, when the defendant makes a timely request that a prophylactic instruction be given, exacts an impermissible toll on the full and free exercise of the privilege. [450 U.S. at 305, 101 S.Ct. at 1121, 67 L.Ed.2d at 254.]

Even though such an instruction calls attention to the failure of the defendant to testify there is no Fifth Amendment violation in a court's giving the instruction without request because the instruction is not adverse to the defendant and "cannot provide the pressure on a defendant found impermissible in *Griffin.*" *Lakeside v. Oregon,* 435 U.S. 333, 339, 98 S.Ct. 1091, 1095, 55 L.Ed.2d 319, 325 (1978).

It has also been determined that at least certain aspects of the privilege against compulsory self-incrimination apply to one who invokes the privilege after that person has been found guilty and before sentencing. We have held that one who had plead guilty but who had not yet been sentenced could not be compelled to be a witness at the trial of a co-defendant on the same charges. *Smith v. State,* 283 Md. 187, 388 A.2d 539 (1978), *cert. denied,* 439 U.S. 1130, 99 S.Ct. 1050, 59 L.Ed.2d 92 (1979). The Supreme Court has also addressed an aspect of the Fifth Amendment right arising out of the sentencing phase of a two-phase capital murder trial in Texas. Texas law requires finding future dangerousness, *inter alia,* before imposing a death penalty. In *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the accused, while confined in jail on the murder charge, had submitted to a pretrial psychiatric examination informally ordered by the trial judge to determine the accused's capacity to stand trial. The psychiatrist did not give any *Miranda* warnings. The state used the defendant's statements against him in the sentencing proceedings. This was held to violate the *Miranda* rule. Answering

contentions that incrimination was complete once guilt had been adjudicated and that the Fifth Amendment privilege had no relevancy to the penalty phase of a capital murder trial, the Court said:

> We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned. Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees. Any effort by the State to compel respondent to testify against his will at the sentencing hearing clearly would contravene the Fifth Amendment. Yet the State's attempt to establish respondent's future dangerousness by relying on the unwarned statements he made to [the psychiatrist] similarly infringes Fifth Amendment values. [451 U.S. at 462–63, 101 S.Ct. at 1873, 68 L.Ed.2d at 369 (footnotes and citations omitted).]

▮▮▮ In the case before us Booth combines the *Griffin* prohibition against adverse commentary on silence and the *Estelle* recognition that there can be self-incrimination after a finding of guilty to urge that the prosecutor's jury argument at his sentencing violated his Fifth Amendment rights. Booth's contention ignores the fact that he did not remain silent and that the prosecutor's comments were directed at Booth's allocution. When more bluntly stated Booth's argument is that the law must pretend that he remained silent because MD.R. 4–343(d) benefited him by allowing him to make for the jury's consideration a statement which was unsworn and not subject to cross-examination. We will not construe this state's prohibition against self-incrimination to incorporate such a fiction.[7]

---

7. Article 22 of the Maryland Declaration of Rights provides "[t]hat no man ought to be compelled to give evidence against himself in a criminal case."

Md.Code (1974, 1984 Repl.Vol.), § 9–107 of the Courts and Judicial Proceedings Article provides:

■ The remaining question is whether the prohibition against compulsory self-incrimination in the Fifth Amendment to the United States Constitution, as applicable to Maryland through the Fourteenth Amendment, imposes a contrary rule. We assume that, if Booth had neither testified nor allocuted at the sentencing phase, the *Griffin* rule would continue to apply. Further, if Booth had testified under oath and subject to cross-examination at his sentencing he would have waived the Fifth Amendment privilege. *Cf. Caminetti v. United States*, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917) (testimony by accused at unitary trial is a waiver). Allocution under Rule 4–343(d) falls between the two. Booth's allocution is more like testimony than silence and for Fifth Amendment purposes is testimonial, carrying with it, at a minimum, a waiver of any privilege to avoid comment by the prosecutor on the allocution.

Although the Supreme Court seems not directly to have addressed this problem, considerable light is cast on it by a capital case from Ohio reported with *McGautha v. California*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), *vacated on other grounds*, 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972).[8] Under the then Ohio procedure the decision on guilt or innocence and, if guilt, the jury role in sentencing were accomplished in one proceeding. Unless the jury, when returning a verdict of guilty of murder, also recommended mercy, a death sentence was automatic. The defendant contended that this procedure placed unconstitutional pressure on him to testify because, if he remained silent with respect to guilt or innocence, as he had done, he suffered imposition of the death penalty without the jury

---

A person may not be compelled to testify in violation of his privilege against self-incrimination. The failure of a defendant to testify in a criminal proceeding on this basis does not create any presumption against him.

**8.** The judgment of the Supreme Court of Ohio was vacated insofar as it left the death penalty undisturbed. The case was remanded for further proceedings in light of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

ever having heard him speak in mitigation of that punishment. The Court did "not think that Ohio was required to provide an opportunity for petitioner to speak to the jury free from any adverse consequences on the issue of guilt." 402 U.S. at 220, 91 S.Ct. at 1474, 28 L.Ed.2d at 734. *A fortiori*, Maryland is not required, when it provides an opportunity for the person found guilty of capital murder to speak to the jury in mitigation of sentence, to make that allocution free from any adverse consequences on the issue of sentence. Having the State argue that allocution is unsworn, not subject to cross-examination, not evidence, and not to be believed is not as adverse as the procedure which passed constitutional muster in *McGautha.*

The issue now before us was presented in a highly analogous format in *Jones v. State,* 381 So.2d 983 (Miss.), *cert. denied,* 449 U.S. 1003, 101 S.Ct. 543, 66 L.Ed.2d 300 (1980). The Mississippi constitution guarantees an accused the right to argue his case to the jury. *Jones* was a two-stage capital murder prosecution. The defendant had not testified on guilt or innocence but elected to argue at the sentencing phase. In his "argument" he told the jury, as facts, matters which were not in evidence. The prosecutor objected on grounds, apparently expressed in the presence of the jury, which included the following:

That's testifying and there's no way to contradict that and it's not fair, Judge, if he doesn't take the stand and let the State cross examine him on this but to stand up here and to be able to do something that the State does not have a right to cross examine him on is not proper.... The State didn't have a right to call him, Judge. We couldn't put him on the stand. [381 So.2d at 998.]

The Supreme Court of Mississippi ruled that the state constitutional right to argue and the rights of the accused under *Griffin*

create a conflict which requires a defendant to make a choice. If he chooses to argue his case to the jury and at the same time invokes the Fifth Amendment, he must confine his remarks to the evidence in the record. The

Fifth Amendment privilege against self-incrimination is a shield, not a sword. A criminal defendant who takes advantage of his right to argue his case to the jury must not be permitted to say all the things he might have testified to had he chosen to call himself as a witness. When he does so, he will be deemed to have waived the right not to have his failure to take the stand commented upon. [381 So.2d at 993.]

And further:

The practical solution to the dilemma presented by the accused who uses his constitutional right to argue his case to the jury to give, what is for all practical purposes, testimony is to treat the unsworn testimonial statements of the accused which were not supported by the record as a partial waiver of the privilege against self-incrimination. It is not a total waiver of the privilege, since the prosecution is unable to cross-examine the accused at this late stage of the trial. But the prosecution may comment to the jury that the defendant's statements were not given under oath and that he was not subject to cross-examination about them. [*Id.*]

*Williams v. State,* 445 So.2d 798 (Miss.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985) held that, unlike *Jones, supra,* there was no waiver where the defendant's opening statement at a capital sentencing hearing asserted self-defense which was already in evidence, albeit not in detail, *via* admissions related by police witnesses.

At the trial resulting in the conviction attacked in *State v. Bontempo,* 170 N.J.Super. 220, 406 A.2d 203 (1979), a post-conviction case, the presiding judge had departed from applicable procedure and allowed the accused who had not testified to make an unsworn statement to the jury in addition to the argument by counsel for the accused. In rebuttal the prosecutor emphasized to the jury that the defendant's statement was not under oath, was not subject to cross-examination, and had omitted explaining aspects of

the evidence against him. To support post-conviction relief Bontempo relied heavily upon *Griffin*. After reviewing many of the cases cited *infra*, the New Jersey court summed up by saying that

> the rationale underlying the decisions cited compels the conclusion that defendant's testimonial behavior before the jury justified the prosecutor's rebuttal. Where, as here, a defendant's unsworn statements take on a "testimonial" color; the jury might well be misled. The accused thereby "gather[s] an advantage that is false, for less than the whole truth may affirmatively mislead." *State v. Fioravanti,* [46 N.J. 109, 118, 215 A.2d 16, 21 (1965), *cert. denied,* 384 U.S. 919, 86 S.Ct. 1365, 16 L.Ed.2d 440 (1966) ]. Thus, a defendant who "undertakes to answer part of the evidence against him [in a testimonial manner] is subject to comment as to factual thrusts he does not meet." *Id.* at 117, 215 A.2d at 20. Here, the prosecutor's comments constituted proper rebuttal and did not serve to violate defendant's Fifth Amendment rights. [170 N.J.Super. at 244–45, 406 A.2d at 215.]

Subsequently, the United States District Court for the District of New Jersey granted Bontempo the writ of habeas corpus but the Third Circuit reversed. *Bontempo v. Fenton,* 692 F.2d 954 (1982), *cert. denied,* 460 U.S. 1055, 103 S.Ct. 1506, 75 L.Ed.2d 935 (1983). The Third Circuit held:

> The circumstances here were unusual. The jury was told that Bontempo's argument could not be considered as evidence and yet he talked about facts which were not in the record. The prosecutor's comments about those unsworn accounts and about Bontempo's failure to mention other relevant events was fair reply to the unorthodox closing argument. The jury's attention had been focused on the facts mentioned in the closing argument, despite the instruction that they were not evidentiary. The prosecutor was not prohibited from recognizing the reality of the situation and answering Bontempo's narrative. We are not persuaded that in so doing the prosecution did

comment on Bontempo's failure to testify. Consequently, *Griffin* is not applicable. [*Id.* at 959.]

The problem under consideration has also arisen at trials on guilt or innocence where the accused, appearing pro se, gives unsworn testimony, not subject to cross-examination, in the course of purportedly questioning witnesses or purportedly arguing from the record. For example, in *United States ex rel. Miller v. Follette,* 278 F.Supp. 1003 (E.D.N.Y. 1968), the petitioner for a writ of habeas corpus complained that at his trial, in which the petitioner had acted as his own attorney, the prosecutor had told the jury in summation that he could not comment upon the accused's failure to take the stand but that the jury should listen closely to the court's charge as to what constituted evidence. Using both a waiver and a harmless error analysis, the petitioned court rejected the contention that petitioner's Fifth Amendment rights as defined in *Griffin* had been violated. It said:

The law is presented with a dilemma. On the one hand, permitting defendant to defend himself without benefit of a lawyer's skills and objectivity may lead him to make statements which can be construed as a total waiver of his privilege against self-incrimination, exposing him to being called by the state. On the other, were defendant allowed to give, what is for all practical purposes, testimony without being subject to some check, the jury might be misled. Faced with such undesirable alternatives, the law seeks a middle ground which accommodates the essence of the opposing interests while furnishing maximum protection to all concerned.

Treating the unsworn testimonial statement of the defendant as a partial waiver of the third aspect of the privilege against self-incrimination [i.e., freedom from adverse comment] provides a practical solution. The prosecution can then be permitted to comment that the defendant's statements were not given under oath while he was subject to cross-examination and that they are, therefore, less weighty than sworn testimony. The constitutional privilege of the criminal defendant appearing

pro se would appear to be adequately protected were he given a clear and direct warning by the court that such limited comment might follow if he continued to give what amounted to unsworn testimony. [*Id.* at 1007.] The Second Circuit affirmed on the harmless error ground, 397 F.2d 363 (1968), and certiorari was denied, 393 U.S. 1039, 89 S.Ct. 660, 21 L.Ed.2d 585 (1969).

In that appeal the prisoner, Miller, relied upon an earlier, two-one decision of the Second Circuit in *United States v. Curtiss,* 330 F.2d 278 (1964). *Curtiss* held that the unsworn and outside-of-the-record excuses given by a pro se defendant for his income tax deficiencies did not constitute a waiver of Fifth Amendment protection and that the prosecutor had violated that protection by arguing that government witnesses had been sworn " 'but the defendant stood down here and he asked a lot of questions.' " *Id.* at 281 (emphasis omitted). Dissenting in *Curtiss,* Judge Medina observed:

> We have come to a pretty pass if, acting as his own lawyer, a defendant in a criminal case can go ahead and say as a lawyer the things he could have testified to in his own defense, and then accuse the prosecutor of violating his Fifth Amendment rights when the prosecutor tells the jury not to believe him, but rather to render their verdict on the testimony given under oath by the witnesses who did testify. [*Id.* at 287.]

When *Miller v. Follette* reached the Second Circuit that court emphasized that Miller himself had referred to his failure to take the stand so that, "[u]nder those circumstances, to regard the prosecutor's restrained remark as an error of constitutional proportions would glorify technicality." 397 F.2d at 367. Absent Miller's own reference, the Second Circuit recognized that it "would be faced with the question of whether *Curtiss* should be reconsidered." *Id.*[9]

---

9. In *United States v. Kaufman,* 429 F.2d 240, 246 (1970), the Second Circuit said in *dictum* that to the extent that some of the pro se

*Curtiss* represents what is definitely the minority position. Most courts which have considered the question hold that the Fifth Amendment does not prohibit comment by a prosecutor on unsworn statements of fact made by a pro se defendant. *See United States v. Lacob,* 416 F.2d 756 (7th Cir.1969), *cert. denied,* 396 U.S. 1059, 90 S.Ct. 755, 24 L.Ed.2d 754 (1970); *Redfield v. United States,* 315 F.2d 76 (9th Cir.1963); *Smith v. United States,* 234 F.2d 385 (5th Cir.1956); *State v. Schultz,* 46 N.J. 254, 216 A.2d 372, *cert. denied,* 384 U.S. 918, 86 S.Ct. 1367, 16 L.Ed.2d 439 (1966);[10] *State v. Polk,* 5 Or.App. 605, 485 P.2d 1241 (1971); *State v. Johnson,* 121 Wis.2d 237, 358 N.W.2d 824 (1984) (no violation by comment that pro se defendant's opening statement was not followed up with proof). And *see* Note, *Criminal Law—Privilege Against Self-Incrimination—Comment on Failure of Accused Appearing Pro Se to Testify,* 38 Temple L.Q. 102 (1964).

We hold that the State's argument did not violate Booth's Fifth Amendment rights.

■■■ The third aspect presented here of the right to remain silent is Booth's claim that the trial court erred in rejecting his proposed instruction No. 17. It read in relevant part:

Every citizen charged with a crime has the right to remain silent at trial, including the sentencing hearing. This is because it is the prosecutor's responsibility at a sentencing to prove the citizen guilty of an aggravating circumstance beyond a reasonable doubt.... Mr. Booth did not testify in this phase, as was his right. You shall not draw any inference of guilt from this choice. You shall not allow this choice to prejudice him in any way.

defendant's statements "might be construed as testimony he may have waived his right to refuse to testify."

**10.** This case was on direct appeal when *Griffin v. California* was decided in 1965.

If you use his choice not to testify in any manner, you will have violated your oath that you have taken as jurors.

The trial judge had advised counsel that the above instruction, as well as two others requested by Booth, would not be given. In charging the jury the trial judge did not comment at all on the effect, if any, upon the jury's deliberations of Booth's having allocuted but not testified. Defense counsel's sole exception to the charge was based on the court's "failure to give our requested instructions in full, in the way they are written."

Appellant's requested instruction No. 17 "in the way [it was] written" was properly denied. It presupposed that Booth had remained silent when Booth had in fact allocuted.[11] To give the instruction in the form requested would have been confusing and an incorrect statement of law under the circumstances here. In his allocution Booth denied having murdered Mr. Bronstein. The jury had just found beyond a reasonable doubt that Booth had murdered Mr. Bronstein with premeditation. The jury could properly consider, from the allocution, that Booth had no remorse and thereby reduce the weight to be given to the mitigating factors which the jury had found did exist.

## XI

Under the heading of his eleventh submission Booth collects three instances in which he claims there was trial court error in some way associated with claimed improper final argument by the prosecutor at the sentencing proceeding. The permissible scope of closing argument is a matter left to the sound discretion of the trial court. The exercise of that discretion will not constitute reversible error unless

---

11. Booth relies heavily on *People v. Ramirez,* 98 Ill.2d 439, 75 Ill.Dec. 241, 457 N.E.2d 31 (1983) which held that one who had been found guilty of capital murder was entitled to a *Carter v. Kentucky* instruction at the life or death sentencing hearing. In that case, however, the defendant had remained silent at the sentencing hearing.

clearly abused and prejudicial to the accused. *See Thomas v. State,* 301 Md. 294, 316, 483 A.2d 6, 17 (1984).

#### A.

 The presentence investigation report, introduced as a joint exhibit at the sentencing hearing, referred to Booth's sentence on May 21, 1972, to three years confinement for assault with intent to maim. That sentence was to be served consecutively to a sentence of four years imposed on May 21, 1971, for robbery. The section on Booth's institutional history explained that "[w]hile incarcerated at the Maryland Correctional Institution, Booth stabbed a fellow inmate, resulting in a consecutive three year sentence for Assault with Intent to Maim imposed on 5/21/72." The presentence report also referred to a November 28, 1978, sentence of five years by the Criminal Court of Baltimore for assault with intent to maim. The employment history section of the report advised that

> [b]etween his 9/77 release and his 6/78 arrest for Assault with Intent to Maim, the defendant was employed briefly as a painter for one Robert Shrwer. It was this employer whom the defendant assaulted, reportedly prompted by unpaid wages, which led to Booth's five year sentence on 11/28/78. This information was obtained from Booth's 1978 Admission Summary—Institutional file.

In the course of argument the prosecutor said:

> Let me explain to you what maim is. It is an ancient crime and the definition of maiming is doing something, hurting somebody in a way in which they would no longer be of service to the king. Maiming means disfiguring somebody, cutting off an ear, gouging out an eye, cutting off a hand. I submit to you, ladies and gentlemen, that short of death, it is the ultimate crime of cruelty.

At that point defense counsel objected, without stating any reasons. The objection was overruled. On this appeal Booth argues that the prosecutor misstated the law and was describing mayhem in his argument.

There was no error. Codified under the "Maiming" subtitle of Md.Code (1957, 1982 Repl.Vol.), Art. 27, "Crimes and Punishment," are §§ 384–386. The convictions of assault with intent to maim referred to in the presentence investigation report were undoubtedly based on violations of § 386 which in relevant part provides that

> [i]f any person ... shall assault or beat any person, with intent to maim, disfigure or disable such person ... every such offender ... shall be guilty of a felony....

Section 386, however, does not define "maim." The specific conduct which constitutes the substantive statutory offense of maiming is set forth in § 385 which deals with

> the crime of cutting out or disabling the tongue, putting out an eye, slitting the nose, cutting or biting off the nose, ear or lip, or cutting or biting off or disabling any limb or member of any person, of malice aforethought, with intention in so doing to mark or disfigure such person....

An assault with intent to maim is an assault perpetrated with the intent to inflict one or more of the injuries described in § 385. The prosecutor's definition of maiming virtually paralleled the words of the statute. Consequently, if defense counsel's objection was based on a claimed misstatement of law by the prosecutor, there was no error in overruling the objection.

The objection more likely went to the last sentence above quoted from the prosecutor's argument which characterized maiming as the ultimate crime of cruelty, short of death. We see no abuse of discretion. We have said that counsel in argument "may indulge in oratorical conceit or flourish." *Wilhelm v. State*, 272 Md. 404, 413, 326 A.2d 707, 714 (1974).

### B.

As the final witness at the sentencing phase, counsel for Booth called a Roman Catholic priest, Father Thomas Schindler, an associate professor at St. Mary's Seminary in

Baltimore where he teaches Christian ethics. The trial judge had conducted a preliminary hearing, outside of the presence of the jury, to determine whether Father Schindler could testify. He was offered as an expert on making ethical judgments. According to Booth's counsel the expert opinion would be offered on "the morality of this situation, the ethics of Mr. Booth and how that should play into an ethical decision-making scheme." The court ruled that Father Schindler "will be permitted to testify within the confines that [defense counsel] has just outlined."

Before the jury Father Schindler testified in substance that moral decisions are made on two fundamental bases, one philosophical and the other religious. The philosophical basis reasons from a criterion of what is right and wrong to an application in a particular situation. The religious basis draws on one's religious background and the commitments of one's particular faith. Based on an interview with Booth, on the presentence investigation, and on Booth's social services record, the witness was of the opinion that, while Booth "knows the golden rule" he "basically makes decisions much as a child would." Father Schindler also told the jury that

> we have to take a Christian approach to things. In other words, try to understand from a faith commitment as a Christian what has always been underscored is that in order to have full justice, it is always necessary that justice be tempered by or shot through with love and mercy.

On cross-examination the State developed, *inter alia,* that the witness had been contacted to testify after the guilty verdict had been rendered and within the preceding week to ten days, and that the interview with Booth had lasted approximately fifty minutes. The witness had never previously testified in a capital case and had never seen the sentencing form. On cross-examination the witness was also asked the following:

Q. Now, Father, when you were contacted, did you know that the defense had asked each [prospective] juror their religion?

A. No. I did not know that.

Q. You didn't?

A. No. I did not.

There was no objection by trial counsel for Booth to the above questions.

■ In the course of the State's summation at the sentencing stage, the prosecutor reviewed the evidence, or lack thereof, as to each mitigating factor listed in the capital punishment statute. In connection with the eighth, or open-ended, factor he discussed Father Schindler's testimony. During that phase of its argument the State referred to the questions asked jurors on voir dire about their religion and to a Catholic priest's having been "recruited" after the guilty verdict. Appellant argues these comments were an improper attack on defense trial counsel. We find no abuse of discretion. The portion of the argument complained of, in the context of the argument as a whole, is part of an attack on Father Schindler's opinion evidence. Set forth in the margin in its entirety is that portion of the State's argument.[12] It was proper argument.

---

12. The only evidence that you heard of what would really be considered a mitigating circumstance is the testimony of Father Schindler. Ladies and gentlemen, I think that it was embarrassing enough that we had this rank attack on your sentimentality—

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[STATE'S ATTORNEY]: —By the defendant's grandmother. But particularly as a Catholic, I am horribly offended by the testimony—

[DEFENSE COUNSEL]: Objection.

[STATE'S ATTORNEY]: —of Father Schindler.

THE COURT: Sustain the objection as to counsel's personal feelings.

[STATE'S ATTORNEY]: Ladies and gentlemen, my personal feelings have nothing to do with this. But realize each one of you, as all of the other hundred or so jurors who were considered for this case, was asked a question by the defense attorneys, what is your religion and how serious are your religious convictions.

## C.

██ Booth also complains of the following passage from the State's argument:

---

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[STATE'S ATTORNEY]: Then after the defendant is convicted, a Catholic priest is gone out and recruited.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[STATE'S ATTORNEY]: When? When? Last Thursday. He met this man for the first time and spent fifty minutes with him. Now he is capable of coming into this court and telling you how you are to ethically go about making the decision before you—

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[STATE'S ATTORNEY]: —How you are going to go about it ethically. The law provides a step-by-step method for you to get where you are supposed to go.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[STATE'S ATTORNEY]: What does he tell us? He tells us really three things. First he tells us that from an ethical point of view, it is in some instances proper to take life. I think we all can understand that. He tells us that the death penalty should be a penalty of last resort. We didn't need an expert to tell us that because each one of us knew that. But what is it that he is selling here in this courtroom? He is selling, that is, his expert analysis indicates that this defendant, when he went into the Bronstein home was suffering from an underdeveloped conscience, an underdeveloped moral ethical capacity. Ladies and gentlemen, that is ridiculousness.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[STATE'S ATTORNEY]: That, ladies and gentlemen, is absurd. Certainly, some people may be more moral than others. I guess it's true. I guess he's [Booth's] a classic example of what he studies all the time. It is impossible for an adult human being, capable of speaking intelligently as you saw John Booth, it is impossible for him not to fully appreciate that it is wrong—

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[STATE'S ATTORNEY]: —to recruit one of your buddies, one of your dope-addicted buddies to go down and break into your neighbor's home, old people, vulnerable people, available people, to overpower them, to tie them up, to gag them, to put a hood over Mr. Bronstein's head and then to take a knife and stab and stab and stab and stab until the knife bends, and a Catholic priest will come in here and say the defendant has an underdeveloped sense of moral capacity that should mitigate his involvement in this crime. It is ridiculous.

If we don't stand together against this crime—

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[STATE'S ATTORNEY]: If we don't stand together against this crime that this killer has committed, then as a community and a people, as a civilization, we stand for absolutely nothing because then we are a community that will not protect itself.

Appellant calls this an impermissible "fear tactic" and a suggestion that the jury transfer responsibility for their decision to the community at large. We see it as an argumentative presentation of the deterrence policy in sentencing. There was no abuse of discretion.

## XII

At sentencing Booth called as his witness the Chairman of the Maryland Parole Commission, William Kunkel. He was asked when Booth would be eligible for parole if a life sentence were to be imposed for the murder of Mr. Bronstein and if maximum sentences were to be imposed, to be served consecutively, for all other crimes of which Booth stood convicted in the subject case.[13] Mr. Kunkel said that under current law Booth would first become eligible in forty-five years, less diminution by credits, *e.g.*, good behavior. This testimony was elicited without objection by the State.

In the course of cross-examination the following transpired:

Q. Can you explain a few other terms to me? What's the term ["]work release["] mean?

---

**13.** The jury was not told that in another case Booth stood convicted of another murder and robbery, committed on Easter Sunday, April 4, 1983. For those crimes Booth had been sentenced to life plus twenty years. Those convictions were on appeal to the Court of Special Appeals at the time of the trial court proceedings in the instant matter. *See Booth v. State,* 62 Md.App. 26, 488 A.2d 195, *cert. granted,* 303 Md. 297, 493 A.2d 351 (1985).

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

Q. Are you familiar with the term?

THE COURT: Just tell us what it means.

A. Yes. I'm familiar with the term ["]work release.["]

The State thereafter developed from Mr. Kunkel, without objection, that there is a work release program in the correctional system under which an inmate is allowed to go into the community and work during the hours of employment, returning to the institution when not working. Permission of the Parole Board is not required for work release. Those decisions are made by institutional authorities in the Department of Correction.

Booth argues here that the overruling of his objection was erroneous and requires vacating the death sentence. There was no answer given to the question to which defense counsel objected. The question was reframed. The basis for the objection was not stated but it clearly appears that the prosecutor interpreted the objection as going to the competency of Mr. Kunkel to testify as to the meaning of "work release," when that program is not administered by the Maryland Parole Commission. The trial court, on the other hand, seems to have assumed that defense counsel was concerned that the witness would not recognize the question to be preliminary and might launch into a general discussion. When the witness said he was familiar with the term, Booth made no further objections to any part of the entire line of testimony on cross-examination concerning work release. Absent objection error in the admission of evidence is not preserved for a review as of right.

The testimony from Mr. Kunkel about parole, adduced by appellant on direct, and about work release, adduced by the State on cross, was not relevant and should have been excluded if proper objections had been made. In *Poole v. State*, 295 Md. 167, 197, 453 A.2d 1218, 1233 (1983),

we said that "[a]ny consideration of the possibility of parole as such simply is irrelevant" in a capital sentencing proceeding. The rationale of *Poole* is applicable to the defense and to the prosecution. We recently so held in *Evans v. State,* 304 Md. 487, 499 A.2d 1261 (1985). There the defense likewise sought to show how far into the future possible parole would be if a life sentence were imposed. The theory of admissibility was that the proffered evidence was relevant to the statutory mitigating circumstance dealing with the unlikelihood of further criminal activity by the defendant that would constitute a continuing threat to society. We said that the trial judge in *Evans* was required to exclude the proffered testimony and pointed out "that one might be likely to engage in criminal activity constituting a threat to those around him whether he is confined in a penal institution or is on parole." *Id.* at 530, 499 A.2d at 1283 (footnote omitted).

In addition to our general duty under § 414(e) in capital cases to consider "any errors properly before [this] Court on appeal," we are also to consider under § 414(e)(1) "[w]hether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." The State's introduction of evidence about work release was not prejudicial in that it did not render the sentencing proceedings unfair. The message which appellant was trying to give the jury through the direct examination of Mr. Kunkel was that Booth would be in his sixties before he could ever be on the streets again, with the inference that by that time his hostility and viciousness should be burned out. Under *Poole* and *Evans,* that evidence was immaterial because persons in the prison community are part of "society" within the meaning of § 413(g)(7). By its cross-examination the State, likewise by eliciting immaterial evidence, sought to correct a possible erroneous impression created by the immaterial testimony on direct, or at least to place that evidence in perspective. The State developed that parole is not the exclusive means by which an inmate can return to the streets so that, by necessary

inference, parole does not exclusively control the time of any such return. From the standpoint of substantial fairness, the State's cross-examination was not improper. The technique which the State employed in meeting the improper evidence produced by Booth is generally recognized and is formally known as the doctrine of curative admissibility. The theory underlying that doctrine is explained in 1 J. Wigmore, *Evidence in Trials at Common Law,* § 15, at 750 (Tiller's rev. ed. 1983).

The danger that the doctrine of curative admissibility is designed to meet is the danger that the jury will draw and use inferences with respect to immaterial matters, not that the jury will rely on unreliable evidence with respect to a material matter. If the latter concern were the true basis for the principle of curative admissibility, there would be no satisfactory reason to permit a counterattack with respect to that material matter by the use of normally inadmissible evidence since, by hypothesis, the rebutting evidence (unless excluded for reasons of social policy) also lacks significant probative value and thus cannot—at least not if we believe in the truth-seeking functions of most of the exclusionary rules known as "relevancy rules"—rationally be expected to diminish the prejudice inflicted by the other party's incompetent evidence. Seen from this perspective, the requirement that the counterattack use evidence similar to that originally received is probably a rough-and-ready way of assuring that the counterattack addresses the immaterial issues raised by the inadmissible evidence originally submitted. [Footnote omitted.]

*See also McCormick on Evidence* § 57 (E. Cleary 3d ed. 1984).

There was no reversible error.

## XIII

■■■ Booth submits that the trial court should have instructed the jury, as Booth requested, that it must find the existence of the mitigating circumstance recognized in

§ 413(g)(6), namely, that "[t]he act of the defendant was not the sole proximate cause of the victim's death." Because Reid is a principal in the second degree to the murder of Mr. Bronstein, Booth says his act is not the sole proximate cause of that death.

This argument was rejected in *Evans*, 304 Md. at 534, 499 A.2d at 1285 where we held that in the context of § 413(g)(6) "the General Assembly intended the words 'proximate cause' to apply only to direct physical causes of the victim's death, and not to acts of a principal in the second degree or an accessory before the fact which aided or abetted the act directly causing death." *See also Huffington v. State*, 304 Md. 559, 574–75, 500 A.2d 272, 279–80 (1985).

## XIV

The trial court furnished to the jury a verdict sheet in the form set forth in Maryland Rule 4–343(e). It listed the seven "statutory" mitigating factors enumerated in § 413(g)(1)–(7) and set forth the open-ended provision of § 413(g)(8) under which the jury could specifically set forth any other facts which it found to be mitigating circumstances and which we shall call "nonstatutory" mitigating circumstances. Booth had asked the trial judge to use a verdict sheet prepared by the defense which listed, in addition to the seven statutory mitigating circumstances, six specific nonstatutory factors which Booth considered had been raised by the evidence. The defense-proffered verdict sheet also allowed for open-ended findings of other mitigating circumstances. The trial judge did not use the defense form of verdict sheet. Appellant now argues "that the trial judge, by limiting the verdict sheet, deprived Appellant of his constitutional right to have the sentencer make an informed decision on whether the death penalty should be imposed based on the use of *all* pertinent data before it." (Emphasis in original).

■ The argument has no merit because the verdict sheet actually used did not limit the jury. The trial judge made this plain in his instructions on nonstatutory mitigating factors. Judge Angeletti told the jury that it could consider under Item 8 in the section devoted to mitigating circumstances on the verdict sheet given to the jury

> any fact or facts that the defendant claims or proposes as a mitigating circumstance or any fact or facts that any member of the jury proposes that could be a potential mitigating circumstance.... If all twelve members of the jury unanimously find that any or all of the proposed facts or mitigating circumstances, either proposed by the defendant or by the members of the jury, have been proven by a preponderance of the evidence, you list them under number eight and consider them....

Booth did not have a right to require a written submission on the verdict sheet of the factors which he claimed existed and operated in mitigation. Indeed, the jury obviously understood that it was not limited to considering whether the statutory mitigating circumstances existed because the jury found nonstatutory mitigating circumstances, *i.e.,* "A. Family Environment," which was particularized as "1. Child Neglect" and "2. Lack of Strong Father Image."

■ We note that MD.R. 4–343(e) provides that "[t]he findings and determinations shall be made in writing in the following form," but we need not decide in the instant case whether the rule prohibits listing proposed nonstatutory factors for the jury's consideration. In any capital murder case a jury is to consider whether the statutory mitigating factors exist, and if one is found to exist, it is a mitigating circumstance as a matter of law. With respect to nonstatutory factors the jury must find both that the circumstance exists and that it is mitigating. *See Foster,* 304 Md. at 482, 499 A.2d at 1258. In *Foster* the trial court had included proposed nonstatutory factors on the verdict sheet for the jury's consideration and had correctly instructed the jury on the difference between statutory and nonstatutory factors. A danger which we foresee in attempting to list possible

mitigating factors is that a trial court could be drawn into ruling that there is no basis for submitting a proposed factor and the court may thereby generate a meritorious issue as to whether the jury had indeed been improperly limited.

## XV, XVI and XVII

The three issues now under consideration all relate to the victim impact statement introduced as joint exhibit two at the sentencing hearing. Md.Code (1957, 1982 Repl.Vol., 1985 Cum.Supp.), Art. 41, § 124 requires in certain cases, including capital cases, the preparation and consideration of victim impact statements.

The statute was amended by Acts of 1983, Chs. 297 and 345, effective July 1, 1983. Because the subject murders were committed before July 1, 1983, Booth contends that application of the amended victim impact statement statute to him is a prohibited *ex post facto* application. This argument was rejected in *Grandison v. State*, 305 Md. 685, 506 A.2d 580 (1986). And *see Dobbert v. Florida*, 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344, 356 (1977).

Appellant also submits that Art. 41, § 124 is unconstitutional and that the introduction of victim impact evidence violates the Eighth and Fourteenth Amendments. The argument common to both of these submissions is that victim impact evidence injects an arbitrary factor into a capital sentencing proceeding. We considered and rejected this argument in *Lodowski v. State*, 302 Md. 691, 735–42, 490 A.2d 1228, 1251–54 (1985), *vacated on other grounds*, —— U.S. ——, 106 S.Ct. 1452, 89 L.Ed.2d 711 (1986). The analysis in *Lodowski* was "considered" *dicta*, intended for the guidance of trial courts and the bar. We apply that analysis in support of our holding here.

Booth further argues that the *Lodowski* analysis rested the relevancy of victim impact information to capital sentencing exclusively on the legislative determination implicit in enacting the statute and that *Lodowski* failed to

consider what Booth calls the constitutional aspects. Certainly a primary purpose of the General Assembly in enacting a requirement for victim impact information was to insure that some consideration would be given to the victims of certain types of crimes when the perpetrator was sentenced, lest the emphasis on the perpetrator as an individual be so great as to exclude consideration of the victim. In capital cases the victims include survivors of the murdered individual.

 There is no *per se* constitutional defect in using a victim impact statement at a capital sentencing proceeding. The sentencing authority is not constitutionally restricted to considering only the operative facts in the commission of the crime, in addition to the circumstances of the perpetrator. This Court, speaking through Judge Cole in *Trimble v. State,* 300 Md. 387, 425, 478 A.2d 1143, 1155 (1984), explained the purposes behind the death penalty.

"The death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders.

"In part, capital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs." [quoting *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2929–30, 49 L.Ed.2d 859, 880 (1976) (opinion announcing judgment) (footnotes omitted).]

 We have also reviewed the particular victim impact statement submitted in this case. Given the nature of the subject matter, it is a relatively straightforward and factual description of the effects of these murders on members of the Bronstein family. We are satisfied that the sentence of death was not imposed in this case under the influence of passion, prejudice or any other arbitrary factor. § 414(e)(1). There was no error here in the admission of the victim impact statement.

## XVIII

Booth has preserved in his eighteenth issue an argument that the Maryland capital sentencing procedure is unconstitutional under the United States Constitution in two respects, mandatoriness and a defendant's burdens. These arguments were rejected as early as *Tichnell v. State* [*Tichnell* I], 287 Md. 695, 415 A.2d 830 (1980) and as recently as our opinion explaining the denial of motions for reconsideration in *Foster v. State, Evans v. State,* and *Huffington v. State,* 305 Md. 306, 503 A.2d 1326 (1986).

## XIX

▮▮▮ We find that the sentence of death in this case is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. § 414(e)(4). Booth killed 78-year-old Irvin Bronstein, while his hands were tied behind his back, by stabbing him in the chest twelve times, for the calculated purpose of preventing him from identifying Booth as a person who had entered the Bronsteins' home and robbed them. Booth murdered Mrs. Bronstein, though not as a principal in the first degree. Booth has been adjudged guilty of another first-degree murder committed approximately one month before the murders of the Bronsteins. That judgment of conviction, while still under review, is presumptively correct. Booth's criminal record also includes the following convictions: escape, 1983; escape, 1980; assault with intent to maim, 1978; assault, 1978; assault, 1975; assault with intent to maim, 1972; robbery, 1970.

Booth's co-perpetrator in the Bronstein murders, Reid, has been sentenced to death as the principal in the first degree of the murder of Mrs. Bronstein. That conviction has been affirmed. The death sentence imposed on Reid is under review but is presumptively correct. *See Reid v. State, supra,* 305 Md. 9, 501 A.2d 436.

▮▮▮ Our comparability review has also included consideration of *Lawrence Johnson v. State,* 303 Md. 487, 495

A.2d 1 (1985) and *Colvin v. State,* 299 Md. 88, 472 A.2d 953 (1984), in each of which we affirmed a death sentence imposed for the murder of an elderly person in that person's residence during the course of an entry and robbery.[14]

JUDGMENT AFFIRMED.

---

**14.** The foregoing opinion does not discuss the jury instructions with respect to the point advanced by Judge McAuliffe in his dissent because no such claim of error in the instructions was raised by Booth in brief or argument on appeal. Even if the point were properly before us, there was no trial court error in the instructions.

What transpired is that one of Booth's proposed instructions dealt with the weighing of mitigating and aggravating circumstances. The last sentence of the three sentence proposed instruction read: "If a comparison of the totality of the aggravating factors with a totality of the mitigating factors leaves you in doubt as to the proper penalty you must impose life imprisonment." The instruction as given reads in relevant part:

Let's go to section three on page five [of the special verdict form]. Now section three says as follows: Based on the evidence, we unanimously find that it has been proven by a preponderance of the evidence that the mitigating circumstances marked yes in section two outweigh the aggravating circumstances marked yes in section one. There is a place for you to indicate yes or no and let me again stress the requirement of unanimity. That is, the finding under circumstance three must be the finding of all twelve jurors. With respect to section three, in balancing the various factors, you are not involved in a mere counting process. It is a weighing process and you may find that a single mitigating circumstance is sufficient in weight to justify a life sentence even if you find more than one aggravating circumstance. Conversely, you may conclude that a single aggravating circumstance, once weighed against the mitigating circumstances, is sufficient to justify a sentence of death. The number of aggravating and mitigating circumstances you find is not determinative in this balancing process. Rather you should decide what weight and quality each factor deserves and by your reasonable judgment in balancing the aggravating and mitigating circumstances, which you find to have been proven[,] you will determine whether the sentence will be life imprisonment or imposition of death. If you find that the mitigating circumstances do not outweigh the aggravating circumstances, the sentence shall be death. If you find that the mitigating circumstances outweigh the aggravating circumstances, the sentence shall be imprisonment for life.

The sole defense exception to the instructions claimed a "failure to give our requested instructions in full, in the way they are written."

The Court in a criminal cause "need not grant a requested instruction if the matter is fairly covered by instructions actually given." MD.R. 4–325(c). Nor may a party assign as error "the failure to give an instruction unless the party objects ... stating distinctly the matter

ELDRIDGE, Judge, concurring in part and dissenting in part.

The Supreme Court of the United States expressly held in *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), that comment by the prosecution on the defendant's refusal to testify is forbidden by the Fifth Amendment. Furthermore, in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court held, under the circumstances, that such comment could not be deemed harmless error.

Departing from the Supreme Court's *Griffin* holding, the majority today decides that a defendant who declines to be a witness in the sentencing phase of his capital murder trial invites criticism for failing to take the stand merely because he exercises his state law right of allocution. The majority construes the defendant's speech in mitigation of his sen-

to which the party objects and the grounds of the objection." MD.R. 4–325(e). This exception is inadequate to call to the trial judge's attention a claimed defect by way of the absence of an instruction on ultimate burden of proof so that the issue was not preserved in the trial court for direct review. Further, the issue was waived on appeal by the omission from appellant's brief of any claim of error in omitting an express instruction covering an even balance result in the weighing process.

Nor is the absence of an equipoise instruction "plain error in the instructions, material to the rights of the defendant, despite a failure to object," of which we might take cognizance under MD.R. 4–325(e). The instruction as given tracked the statute. In *Foster v. State,* 304 Md. 439, 477–78, 499 A.2d 1236, 1256 (1985), we explained that the statute does not contain a clear inference regarding the allocation of the burden of proof or risk of nonpersuasion absent an additional provision specifying the result if the sentencing authority found that mitigating and aggravating circumstances were in a state of even balance or if the sentencing authority was unable to determine which outweighed the other. Consequently, in *Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980), this Court interpreted the statute to place the burden of persuasion upon the prosecution with regard to the weighing of aggravating and mitigating circumstances. Because the statute does not place the burden of persuasion with regard to the weighing process on the accused, the instructions in the instant case which tracked the statute did not place the burden on the accused.

By this analysis we do not indicate any opinion on the constitutionality of a statute imposing such a "burden" on a capital defendant.

tence as a waiver of his Fifth Amendment right not to be a witness, and accordingly allows the prosecution to rebuke the defendant for not taking an oath and submitting to cross examination. I disagree.

In his closing argument to the jury in the sentencing phase of this capital murder trial, the prosecutor said:

"[PROSECUTING ATTORNEY]: There is but one reason John Booth did not take the witness stand and present his story as he told it to you in allocution. I'm not so naive a man to believe Mr. Booth would be so moved by the prospect of an oath that he would not break his oath. But, ladies and gentlemen, he stood here and testified, not under oath, for one reason only, to avoid cross-examination.

"[DEFENSE ATTORNEY]: Objection, your Honor.

"THE COURT: Overruled.

"[PROSECUTING ATTORNEY]: I assure you we had some questions for Mr. Booth. I ask you, don't be conned by this con man, don't be conned by this man who travels with fifteen names, don't be conned by a most accomplished liar."

These statements expressly criticized the defendant for declining to testify under oath and for avoiding cross examination. Such statements should not be included among the responses properly allowed by the majority opinion when a defendant exercises his right to allocute, namely, a rebuttal by record evidence and a reminder that what is said in allocution is not under oath, not subject to cross examination, and not evidence.

Comment on the refusal to testify penalizes the defendant for exercising a constitutional privilege. *Griffin v. California, supra*, 380 U.S. at 614, 85 S.Ct. at 1232. In fact, long before the Supreme Court's decision in *Griffin*, this Court flatly held that such comment violated a defendant's rights and was improper. *Smith v. State*, 169 Md. 474, 476, 182 A. 287 (1936). When a timely objection is made, as it was here, and no curative instruction is given, this kind of

comment ordinarily constitutes clear prejudice and requires reversal. *Dill v. State,* 10 Md.App. 362, 364, 270 A.2d 489 (1970). *See also McDonald v. State,* 61 Md.App. 461, 476, 487 A.2d 306 (1985).

When a defendant does not take the stand, but nevertheless injects unsupported or disputed factual statements into allocution, jury argument or questions to a witness, some courts have found a limited waiver of the defendant's privilege to avoid adverse comment on his silence. *See, e.g., Jones v. State,* 381 So.2d 983 (Miss.), *cert. denied,* 449 U.S. 1003, 101 S.Ct. 543, 66 L.Ed.2d 300 (1980); *Bontempo v. Fenton,* 692 F.2d 954 (3d Cir.1982), *cert. denied,* 460 U.S. 1055, 103 S.Ct. 1506, 75 L.Ed.2d 935 (1983); *United States ex rel. Miller v. Follette,* 278 F.Supp. 1003 (E.D.N.Y.), *aff'd* 397 F.2d 363 (2d Cir.,1968), *cert. denied,* 393 U.S. 1039, 89 S.Ct. 660, 21 L.Ed.2d 585 (1969). The majority relies upon this line of cases. Such reliance, however, is misplaced.

The principal case relied on by the majority is the opinion of the Supreme Court of Mississippi in *Jones v. State, supra.* In *Jones,* the defendant declined to testify at the guilt or innocence phase of his trial for murder, but in his argument to the jury at the sentencing phase he made factual allegations unsupported by the record. The Mississippi Court ruled that "the prosecution may comment to the jury that the defendant's statements were not given under oath and that he was not subject to cross-examination about them." 381 So.2d at 993. In a subsequent case, *Williams v. State,* 445 So.2d 798 (Miss.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985), after the defendant, at the sentencing phase of his murder trial, had made an unsworn statement not supported by the record, the prosecution "commented to the jury, in unfavorable terms, about the [defendant's] failure to give his version of the facts while under oath and subject to cross examination." 445 So.2d at 814. The court noted its limited waiver holding in *Jones, supra,* and held that the prosecution's comment, along with other errors, required reversal for a new sentencing proceeding. The Mississippi Court thus distin-

guished comments explaining the nature of allocution from comments criticizing the defendant for not giving testimony.

The same distinction appears in *State v. Bontempo*, 170 N.J.Super. 220, 406 A.2d 203 (1979), and *Bontempo v. Fenton, supra,* 692 F.2d 954. Both the state and federal post conviction proceedings in *Bontempo* determined that the prosecution's comments constituted proper rebuttal to the defendant's statements and did not amount to comments on the defendant's failure to testify. 170 N.J.Super at 244–245; 692 F.2d at 959.

Even when defendants represent themselves and try to evade the hazards of taking the stand by interjecting factual statements into their legal defense, courts will protect the defendants' Fifth Amendment rights and allow the prosecution to comment only "that the defendant's statements were not given under oath while he was subject to cross examination and that they are, therefore, less weighty than sworn testimony." *United States ex rel. Miller v. Follette, supra,* 278 F.Supp. at 1007. The prosecution or court is allowed to comment on the quality of the statements made, but not to comment on the defendant's decision not to take the stand. *State v. Polk,* 5 Or.App. 605, 485 P.2d 1241 (1971); *State v. Johnson,* 121 Wis.2d 237, 358 N.W.2d 824 (1984). *See Redfield v. United States,* 315 F.2d 76 (9th Cir.1963); *Smith v. United States,* 234 F.2d 385 (5th Cir.1956); *State v. Schultz,* 46 N.J. 254, 216 A.2d 372, *cert. denied,* 384 U.S. 918, 86 S.Ct. 1367, 16 L.Ed.2d 439 (1966).

I agree with the majority that the prosecuting attorney in this case was entitled to tell the jury that evidence includes testimony under oath or subject to cross examination, but I cannot agree that the prosecution is permitted to tell the jury that the defendant did not take the witness stand in order to avoid cross examination.

I concur in the judgment insofar as it upholds the guilty verdicts, but I would remand the case for a new capital sentencing proceeding.

COLE, Judge, concurring in part and dissenting in part.

The Court today affirms its dicta in *Lodowski v. State*, 302 Md. 691, 490 A.2d 1228 (1985) regarding victim impact statements and holds that there is no constitutional defect in the use of this evidence in capital sentencing proceedings. I vehemently disagree, and for the reasons stated in my opinion in *Lodowski*, I dissent.

Because of the importance of the constitutional issues involved, I shall restate in part what I said in *Lodowski* to show that the portion of Md.Code (1957, 1982 Repl. Vol., 1985 Cumm.Supp.), Art. 41, § 124(d) authorizing the use of victim impact statements in capital sentencing proceedings is unconstitutional and that the admission of victim impact evidence in this case violated the eighth and fourteenth amendments of the United States Constitution.

I prefaced my opinion in *Lodowski* with several observations which I shall reiterate. First I do not object to the use of relevant victim impact evidence from the victim in *noncapital* sentencing proceedings. Such evidence can be valuable in sentencing proceedings, and when "coupled with active victim participation, acts to restore and increase confidence in the criminal justice system." 302 Md. at 754, 490 A.2d at 1260. My objection here is to the use of impact statements from the family of the victim in capital sentencing proceedings. I sympathize with the families of victims of heinous crimes and I realize that these persons suffer immense pain and untold emotional trauma. Nevertheless, "the court's paramount duty is to preserve the integrity and fundamental fairness of the criminal justice system guaranteed to every citizen under our federal and state constitutions." *Id.*

I

In *Lodowski*, I reviewed the Supreme Court decisions delineating the constitutional boundaries of capital sentencing procedures. I shall not repeat this analysis here, but I must stress that my discussion in *Lodowski* makes clear

that the eighth and fourteenth amendments require two basic safeguards in capital sentencing proceedings: (1) the death penalty must "not be imposed under sentencing procedures that create[ ] a substantial risk that it [will] be inflicted in an arbitrary and capricious manner," *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859, 883 (1976) (Stewart, J., joined by Powell and Stevens, JJ.); and (2) capital sentencing procedures must "guide[ ] and focus[ ] the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender." *Jurek v. Texas*, 428 U.S. 262, 273–74, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929, 939 (Stevens, J., joined by Stewart and Powell, JJ.) (emphasis supplied); *see also Proffitt v. Florida*, 428 U.S. 242, 259, 96 S.Ct. 2960, 2970, 49 L.Ed.2d 913, 927 (1976) (Powell, J., joined by Stewart and Stevens, JJ.). These principles form the constitutional foundation for modern death penalty statutes, and it is in light of these precepts that the use of victim impact evidence must be examined.

The use of victim impact statements in capital sentencing proceedings in Maryland is authorized by Art. 41, § 124(d), which provides:

(d) In any case which the death penalty is requested under Article 27, § 412, a presentence investigation, *including a victim impact statement*, shall be completed by the Division of Parole and Probation, and shall be considered by the court or jury before whom the separate sentencing proceeding is conducted under Art. 27, § 413. [Emphasis supplied.]

Section 124(c)(3) describes the victim impact statement itself. It states:

(3) A victim impact statement shall:

(i) Identify the victim of the offense;

(ii) Itemize any economic loss suffered by the victim as a result of the offense;

 (iii) Identify any physical injury sufferd by the victim as a result of the offense along with its seriousness and permanence;

 (iv) Describe any change in the victim's personal welfare or familial relationships as a result of the offense;

 (v) Identify any request for psychological services initiated by the victim or the victim's family as a result of the offense; and

 (vi) Contain any other information related to the impact of the offense upon the victim or the victim's family that the court requires.

I believe that the language providing for the use of victim impact statements in capital sentencing proceedings cannot withstand constitutional scrutiny under the eighth and fourteenth amendment principles set forth *ante*. As I stated in *Lodowski*,

> At a constitutional minimum, evidence introduced at a capital sentencing proceeding must be relevant as to whether the accused's life be taken or spared. The information must be relevant, of course, to avoid the arbitrary and capricious infliction of the death penalty. In light of this standard, several portions of § 124(c)(3) pass muster. For instance, the identity of the victim (e.g., police officer) is often relevant, *see* § 124(c)(3)(i), as is other information that goes to the character of the defendant and the circumstances of the offense, *see* § 124(c)(3)(vi).

> Other information called for by § 124(c), however, would rarely, if ever, be relevant in a capital sentencing proceeding. In particular, psychological services requested by the victim's family as a result of the offense are irrelevant. *See* § 124(c)(3)(v). In addition, it is difficult to see the relevance of whether the victim suffered any economic loss as a result of the offense, unless of course the victim was murdered during the course of a robbery or similarly economically-motivated crime. *See* § 124(c)(3)(ii). Section 124(c)(3)(iii), which deals with the

identification of any physical injury suffered by the victim as a result of the crime along with its seriousness and permanence, seems superfluous in a capital case for obvious reasons. Lastly, any changes in the victim's familial relationships as a result of the offense are irrelevant to the sentencing decision. *See* § 124(c)(3)(iv). Otherwise, a factor in imposing the death penalty would always be whether the victim died leaving a family. Few factors could be as irrelevant and arbitrary as those called for in §§ 124(c)(3)(ii), 124(c)(3)(iii), 124(c)(3)(iv), and 124(c)(3)(v). 302 Md. at 764, n. 6, 490 A.2d 1228, n. 6.

This type of evidence, then, interjects into the capital sentencing proceedings that same uncertainty and subjectivity decried by the Supreme Court in *Gregg, Profitt* and *Jurek*. What can be a more arbitrary factor in the decision to sentence a defendant to death than the words of the victim's family, which vary greatly from case to case, depending upon the ability of the family member to express his grief, or even worse depending upon whether the victim has family at all? In more practical terms, a killer of a person with an educated family would be put to death, whereas in a crime of similar circumstances, the killer of a person with an uneducated family or one without a family would be spared. This result cannot be countenanced, if only upon the realization that lives cannot be compared as to their respective worth.

As I see it, the ultimate crime is the taking of a life, and there can be no further measurement as to the value of the life taken. The proper focus in the capital sentencing procedure must be upon the circumstances "of the individual offense and the individual offender," *Jurek v. Texas, supra,* 428 U.S. at 273–74, 96 S.Ct. at 2957, 49 L.Ed.2d at 939 (Stevens, J., joined by Stewart & Powell, JJ.), and not upon the particular victim's family.

In support of its holding that there is no *per se* constitutional error in the use of victim impact statements in capital proceedings, the Court quotes the following from *Trimble v. State,* 300 Md. 387, 425, 478 A.2d 1143, 1155 (1984):

"The death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders.

"In part, capital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs." [Quoting *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2929–30, 49 L.Ed.2d 859, 880 (1976) (opinion announcing judgment) (footnotes omitted).]

In quoting this passage from *Trimble,* which is an exact quote from *Gregg v. Georgia,* the majority fails to note that *Gregg* also stands for the proposition that society's outrage at criminal acts and its need for retribution must be tempered by objectivity in the determination of whether a person is to be put to death. The *Gregg* plurality recognized that our moral outrage at offensive conduct may not be vented in an arbitrary and capricious manner. *Gregg v. Georgia, supra,* 428 U.S. at 188, 96 S.Ct. at 2932, 49 L.Ed. at 883 (Stewart, J., joined by Powell and Stevens, JJ.). Integral to the "legal process" on which our citizens must rely is the guarantee that the process will be fair and that our laws will be applied uniformly. Because victim impact evidence robs a capital sentencing proceeding of fairness and uniformity, its use cannot justifiably be sanctioned.

## II

Putting aside the constitutionality of the statute itself, it is clear in this case that the victim impact evidence is unconstitutional. I stated in *Lodowski* that:

Time and again, the Supreme Court has emphasized that the sentencer's discretion in a capital proceeding must be channeled and guided by clear, specific, and objective standards. *See, e.g., Barclay v. Florida, supra,* 463 U.S. [939] at 949, 103 S.Ct. [3418] at 3424, 77 L.Ed.2d [1134] at 1144; *Godfrey v. Georgia, supra,* 446 U.S. [420]

at 428, 100 S.Ct. [1759] at 1764–65, 64 L.Ed. [398] at 406; *Woodson v. North Carolina, supra,* 428 U.S. [280] at 303, 96 S.Ct. [2978] at 2990–91, 49 L.Ed.2d [944] at 960. Evidence that has the effect of arousing the passion and prejudice of the sentencer does not satisfy this constitutional standard. Similarly, evidence irrelevant to the sentencing decision has no place in a capital sentencing proceeding.

302 Md. at 764–65, 490 A.2d at 1265–66. As in *Lodowski,* a review of the victim impact statement in this case clearly demonstrates these points.

Agent Michelle Swann prepared a victim impact statement through interviews with the victims' son, daughter, son-in-law, and granddaughter. Agent Swann writes of the victims' son that he:

saw his parents alive for the last time on May 18th. They were having their lawn manicured and were excited about the onset of spring. He called them on the phone that evening and received no answer. He had made arrangements to pick Mr. Bronstein up on May 20th. They were both to be ushers in a granddaughter's wedding and were going to pick up their tuxedos. When he arrived at the house on May 20th he noticed that his parents' car wasn't there. A neighbor told him she hadn't seen the car in several days and he knew something was wrong. He went to this [sic] parents' house and found them murdered. He called his sister crying and told her to come right over because something terrible had happened and their parents were both dead.

\* \* \* \* \* \*

The victims' son states that he can only think of his parents in the context of how he found them that day, and he can feel their fear and horror. It was 4:00 p.m. when he discovered their bodies and this stands out in his mind. He is always aware of when 4:00 p.m. comes each day, even when he is not near a clock. He also wakes up at 4:00 a.m. each morning. The victims' son states that he suffers from a lack of sleep. He is unable to drive on

the streets that pass near his parents' home. He also avoids driving past his father's favorite restaurant, the supermarket where his parents shopped, etc. He is constantly reminded of his parents. He sees his father coming out of synagogues, sees his parents' car, and feels very sad whenever he sees old people. The victims' son feels that his parents were not killed, but were butchered like animals. He doesn't think anyone should be able to do something like that and get away with it. He is very angry and wishes he could sleep and not feel so depressed all the time. He is fearful for the first time in his life, putting all the lights on and checking the locks frequently. His children are scared for him and concerned for his health. They phone him several times a day. At the same time he takes a fearful approach to the whereabouts of his children. He also calls his sister every day. He states that he is frightened by his own reaction of what he would do if someone hurt him or a family member. He doesn't know if he'll ever be the same again.

As with the testimony of Fletcher's widow in *Lodowski,* the testimony of the Bronsteins' son, however deserving of sympathy,

> does not channel and guide the sentencer's discretion in a constitutionally permissible manner. By appealing to the passions and prejudices of the sentencing authority, the above quoted passage[ ] represent[s] an "arbitrary factor" in the decisional process. In my view, it is arbitrary to base a decision as to whether an accused should live or die on the basis of subjective impressions a [family member] has of the crime.... Predicating the death penalty decision on this type of evidence propels us full force to the pre-*Furman* era of the arbitrary imposition of capital punishment.

302 Md. at 766, 490 A.2d at 1266.

The portion of the victim impact statement dealing with the impact of the victims' deaths upon their daughter and her husband further demonstrates this conclusion:

The victims' daughter and her husband didn't eat dinner for three days following the discovery of Mr. and Mrs. Bronstein's bodies. They cried together every day for four months and she still cries every day. She states that she doesn't sleep through a single night and thinks a part of her died too when her parents were killed. She reports that she doesn't find much joy in anything and her powers of concentration aren't good. She feels as if her brain is on overload. The victims' daughter relates that she had to clean out her parents' house and it took several weeks. She saw the bloody carpet, knowing that her parents had been there, and she felt like getting down on the rug and holding her mother. She wonders how this could have happened to her family because they're just ordinary people. The victims' daughter reports that she had become noticeably withdrawn and depressed at work and is now making an effort to be more outgoing. She notes that she is so emotionally tired because she doesn't sleep at night, that she has a tendency to fall asleep when she attends social events such as dinner parties or the symphony. The victims' daughter states that wherever she goes she sees and hears her parents. This happens every day. She cannot look at kitchen knives without being reminded of the murders and she is never away from it. She states that she can't watch movies with bodies or stabbings in it. She can't tolerate any reminder of violence. The victims' daughter relates that she used to be very trusting, but is not any longer. When the doorbell rings she tells her husband not to answer it. She is very suspicious of people and was never that way before.

The victims' daughter attended the defendant's trial and that of the co-defendant because she felt someone should be there to represent her parents. She had never been told the exact details of her parents' death and had to listen to the medical examiner's report. After a certain point, her mind blocked out and she stopped hearing. She states that her parents were stabbed repeatedly with

viciousness and she could never forgive anyone for killing them that way. She can't believe that anybody could do that to someone. The victims' daughter states that animals wouldn't do this. They didn't have to kill because there was no one to stop them from looting. Her father would have given them anything. The murders show the viciousness of the killer's anger. She doesn't feel that the people who did this could ever be rehabilitated and she doesn't want them to be able to do this again or put another family through this. She feels that the lives of her family members will never be the same again.

As I said in *Lodowski*, "the punishment of death, unique in its severity and irrevocability, *see Gregg v. Georgia, supra,* 428 U.S. at 187, 96 S.Ct. at 2931, 49 L.Ed.2d at 882, should not turn upon these considerations." 302 Md. at 767, 490 A.2d at 1267.

Agent Swann also reports the following concerning the victims' grandchildren:

Since the Jewish religion dictates that birth and marriage are more important than death, the granddaughter's wedding had to proceed on May 22nd. She had been looking forward to it eagerly, but it was a sad occasion with people crying. The reception, which normally would have lasted for hours, was very brief. The next day, instead of going on her honeymoon, she attended her grandparents' funerals. The victims' son, who was an usher at the wedding, cannot remember being there or coming and going from his parents' funeral the next day. The victims' granddaughter, on the other hand, vividly remembers every detail of the days following her grandparents' death. Perhaps she described the impact of the tragedy most eloquently when she stated that it was a completely devastating and life altering experience.

\* \* \* \* \* \*

The victims' granddaughter states that unless you experience something like this you can't understand how it feels. You are in a state of shock for several months and then a terrible depression sets in. You are so angry and feel such

rage. She states that she only dwells on the image of their death when thinking of her grandparents. For a time she would become hysterical whenever she saw dead animals on the road. She is not able to drive near her grandparents' house and will never be able to go into their neighborhood again. The victims' granddaughter also has a tendency to turn on all the lights in her house. She goes into a panic if her husband is late coming home from work. She used to be an avid reader of murder mysteries, but will never be able to read them again. She has to turn off the radio or T.V. when reports of violence come on because they hit too close to home. When she gets a newspaper she reads the comics and throws the rest away. She states that it is the small everyday things that haunt her constantly and always will. She saw a counselor for several months but stopped because she felt no one could help her.

The victims' granddaughter states that the whole thing has been very hard on her sister too. Her wedding anniversary will always be bittersweet and tainted by the memory of what happened to her grandparents. This year on her anniversary she and her husband quietly went out of town. The victims' granddaughter finds that she is unable to look at her sister's wedding pictures. She also has a picture of her grandparents, but had to put it away because it was too painful to look at it.

Again although deserving of much sympathy, the effect of the victims' death upon their grandchildren is irrelevant to the sentencing process and serves only to arouse the passion and prejudice of the sentencer.

### III

In its closing argument, the State referred to the victim impact statement and argued as follows:

Ladies and gentlemen, if they prove the one mitigating circumstance or if they prove two or ten or a hundred or

two hundred or a thousand, nothing whatsoever about this man, about his background, about his feelings, about his emotions, about his moral capacity, could ever, in any way, outweigh the importance of what he did that day in May last year.... *If you get to section three and you have to balance it, take this presentence report and read out loud what is entitled the victim impact statement. For ladies and gentlemen that is the ultimate dimension of the crime he has committed....* [Emphasis supplied.]

As I noted in *Lodowski*, however, the procedure for the determination of whether the defendant must be put to death under § 413 does not include the victim impact statement as one of the aggravating circumstances to be weighed against the mitigating circumstances:

> Of the ten aggravating circumstances listed in § 413(d), none specifically provides for consideration of victim impact evidence. Moreover, § 413(d) does not contain a "catch-all" similar to that set forth in the mitigating circumstances subsection (§ 413(g)) that would permit the sentencing authority to consider victim impact evidence. In the case *sub judice*, the sentencer did not consider the victim impact evidence as a mitigating circumstance. For obvious reasons, victim impact evidence would rarely, if ever, be considered as a mitigating circumstance. Thus, the sentencer necessarily must have considered that evidence as an aggravating circumstance without entering it into the formal statutory weighing process. Nowhere does § 413 permit the sentencing authority to weigh the mitigating and aggravating circumstances, then the victim impact evidence, at the time of sentencing. The imposition of the death penalty in this case therefore did not comport with the sentencing procedures contained in § 413.

302 Md. at 785–86, 430 A.2d at 1276.

Impact evidence from the victim's family has but one purpose: "to exacerbate the aggravating circumstances es-

tablished by the prosecution." *Id.* at 786, 490 A.2d at 1276. This type of evidence, however, has no place in a statutory weighing process which owes its very existence to the constitutional mandate that the death penalty must not be administered in an arbitrary or capricious manner.

In my view, victim impact evidence as was introduced in Booth's death sentencing is constitutionally impermissible. While I concur in the judgment insofar as it upholds the guilty verdicts, I would vacate the sentence and remand for another sentencing proceeding which does not include such evidence.

McAuliffe, Judge, concurring in part and dissenting in part.

I concur in the affirmance of the conviction, but dissent from the decision to affirm the sentence of death.

For the reasons stated in the concurring and dissenting opinion in *Evans v. State*, 304 Md. 487, 539–40, 499 A.2d 1261 (1985), I believe the Maryland death penalty statute is in part unconstitutional. I agree with the contention made by Booth in his eighteenth argument that our statute impermissibly places the burden on the defendant to prove that mitigating circumstances outweigh aggravating circumstances in order to avoid the penalty of death.

Unfortunately, the erroneous allocation of the burden of persuasion that originated in the statute was perpetuated in the instructions given to this jury. Although the trial judge stated he was granting Booth's proposed instruction number 9, which correctly assigned to the State the burden of establishing that the aggravating circumstances outweighed the mitigating circumstances in order to justify a sentence of death, he did not give that instruction.[1] Rather,

---

1. The majority opinion sets forth, in footnote 14, only the concluding sentence of Booth's proposed Instruction No. 9. I believe it is helpful to view the proposed instruction in its entirety:

Your next duty will be to weigh any mitigating circumstances which exists (sic) against any aggravating circumstances which exist.

he instructed the jury in the language of the statute and of the Findings and Sentencing Determination Form, and therefore effectively conveyed to the jury the erroneous message that in order to avoid a sentence of death the burden rested upon the defendant to prove by a preponderance of the evidence that the mitigating circumstances outweighed the aggravating circumstances.

I would vacate the sentence and remand for a new sentencing proceeding.

---

Because the State is attempting to establish that death is the appropriate punishment, the State bears the burden of establishing that the aggravating circumstances which you find outweigh the mitigating circumstances. Unless you find, after considering the totality of the aggravating and mitigating circumstances, that the aggravating factors, discounted by whatever mitigating circumstances exist, are sufficiently serious to require the sentence of death, you must impose life imprisonment. If a comparison of the totality of the aggravating factors with a totality of the mitigating factors leaves you in doubt as to the proper penalty you must impose life imprisonment.